**HPD LABORATORIES, INC.,**
**d/b/a Global Household**
**Brands, Plaintiff,**

v.

**The CLOROX COMPANY, Defendant.**

**No. Civ.A. 99–4620 (HAA) (SRC).**

United States District Court,
D. New Jersey.

June 8, 2001.

Gilbert W. Bowman, Poff & Bowman LLC, Hawthorne, New Jersey, Steven Bazerman, Bazerman & Drangel, P.C., New York City, for plaintiff.

Robert J. Schoenberg, Riker, Danzig, Scherer, Hyland & Perretti LLP, Morristown, New Jersey, Brooks Beard, Morrison & Forester LLP, San Francisco, California, for defendant.

**OPINION**

CHESLER, United States Magistrate Judge.

This discovery dispute presents an interesting question about the scope of the attorney-client privilege. Plaintiff, HPD Laboratories, Inc. ("HPD"), seeks to compel defendant, The Clorox Company ("Clorox"), to turn over documents that contain statements to and from Karen Peeff ("Ms. Peeff"), a longtime paralegal in Clorox's in-house legal department. Clorox objects and contends that the documents are cov-

ered by the attorney-client privilege, as defined by California law. HPD disagrees and reasons that, under federal law, the attorney-client privilege does not encompass Ms. Peeff's communications because she acted independently rather than in conjunction with or at the direction of an attorney. For the following reasons, the documents are not privileged and are discoverable.[1]

## I. BACKGROUND

### A. The Parties

This is a patent infringement and unfair competition action between competitors in the bathroom cleaning products market. HPD, a Delaware corporation headquartered in Edison, New Jersey, claims to be a pioneer in the development of toilet bowl cleaning systems. (Second Am.Compl. at ¶ 1.) It sells "2000 Flushes Blue Plus Bleach," an automatic toilet cleaner that combines bleaching and detergent agents.

Clorox, a California-based company, does business throughout the nation. It markets—or has marketed—various toilet cleaners, including "Clorox Bleach and Blue Automatic Toilet Bowl Cleaner" and "Clorox Rain Clean Automatic Toilet Bowl Cleaner." It currently sells a number of its products, including Rain Clean, in New Jersey.

To facilitate its operations, Clorox maintains an in-house legal team. Karen Peeff has been a part of that team since 1985. (Decl. of Karen Peeff at ¶ 2.) She currently serves as a "Legal Specialist" for advertising and regulatory matters.[2] Her duties include (1) reviewing prospective product labels, packages, and advertisements; (2) assessing whether those items comply with apposite state and federal statutes and regulations; and (3) advising Clorox's marketing department on compliance issues. (Id. at ¶ 3.) Ms.

Peeff's immediate supervisor is Patrick Meehan, an attorney. (Id. at ¶ 6.) Notably, Ms. Peeff admits that she does not regularly consult with her supervisor, or other in-house counsel, prior to dispensing advice. (Id. at ¶ 5.)

### B. The Parties' Respective Products

HPD asserts that it has developed, manufactured, and sold "drop-in" toilet cleaning products since 1984. Over time, it produced commercially viable chlorine bleach tablets, which remove stains, kill germs, and deodorize; as well as colored detergent blocks, which contain surfactants that prevent stains from occurring. (Second Am.Compl. at ¶¶ 5, 7.)[3] Beginning in 1993, HPD began developing a toilet cleaner that combined bleaching and detergent elements. That endeavor came to fruition in May 1995 when HPD applied for a patent for the new product. (Id. at ¶ 8.)[4] HPD began selling that product one month later as 2000 Flushes Blue Plus Bleach ("2000 Flushes"). The packaging gave notice that HPD's patent application was pending. (Id.)

Shortly after HPD introduced 2000 Flushes, Clorox started marketing Clorox Bleach and Blue Automatic Toilet Bowl Cleaner ("Bleach & Blue"). Like 2000 Flushes, Bleach & Blue contained bleach and detergent. (Id. at ¶ 9.) Anticipating the issuance of its patent, HPD informed Clorox that its product infringed upon the allowed claims for the 2000 Flushes patent, to no avail.

In May 1998, the Patent Office issued United States Patent 5,755,330 ("the 330 Patent") for HPD's product. The 330 Patent covered:

A package for containing two automatic toilet bowl cleaners, one containing a

---

1. This controversy did not take shape through traditional motion practice. Instead, the parties raised their issues in a series of letters, which resulted in a conference call with the Court. See L.Civ.R. 37.1(a). That call clarified the main area of disagreement and, subsequently, Clorox presented the disputed documents for in camera review. The parties also submitted additional briefing and created an evidentiary record. They now agree that their dispute is ripe for adjudication. After considering their submissions, the Court opted to resolve this matter on the papers. See Fed.R.Civ.P. 78.

2. A Legal Specialist at Clorox is equivalent to a paralegal elsewhere.

3. The Court relies on HPD's Second Amended Complaint merely to provide requisite background information and expresses no opinion on the merit or veracity of HPD's claims.

4. HPD's predecessor in interest, Block Drug Company, Inc., actually applied for the patent. Block Drug subsequently assigned its interests to HPD. (Second Am.Compl. at Ex. A.)

bleaching cleaner and the other containing a detergent cleaner and a fragrance or dye ... In operation, the water in the toilet cistern and bowl is cleaned both by the detergent and the bleaching agent ...

(*Id.* at Ex. B.) HPD contends that it immediately informed Clorox of the 330 Patent and demanded that Clorox terminate the Bleach & Blue line. Clorox purportedly ignored HPD's overtures until some time in 1999, when it replaced Bleach & Blue on store shelves with Clorox Rain Clean Automatic Toilet Bowl Cleaner ("Rain Clean").

According to HPD, 2000 Flushes was the only legitimate detergent plus bleach toilet cleaner on the market following the withdrawal of Clorox Bleach & Blue. Its replacement, Rain Clean, did not contain an efficacious chlorine bleaching agent. (*Id.* at ¶¶ 16,18.) Instead, it merely included small quantities of oxygen bleach that, in HPD's view, did not clean, deodorize, or eradicate germs. (*Id.* at ¶ 16.) Despite the absence of a functional bleach component, Clorox purportedly advertised Rain Clean as bleach-containing toilet cleaner. (*Id.* at ¶¶ 14–18.) HPD claims that it suffered diminished sales because of Clorox's deceptive marketing, ostensibly because consumers purchased Rain Clean over 2000 Flushes under the mistaken belief that the two products were equivalents.

### C. *The Litigation*

HPD filed this suit in September 1999. It accused Clorox of (1) willfully infringing the 330 Patent by selling Bleach & Blue in violation of 35 U.S.C. § 271; (2) falsely advertising Rain Clean in derogation of 15 U.S.C. § 1125; (3) committing unfair competition under N.J.S. § 56:8–2 and New Jersey common law; and (4) tortious interference with business relations. HPD seeks a combination of injunctive and monetary relief to remedy these alleged wrongs.

Discovery ensued and, at times, became contentious. In addition to professing concerns about the confidential nature of their business information, the parties raised numerous objections to document production. Clorox's invocation of the attorney-client privilege—to avoid disclosing communications between Ms. Peeff and its marketing employees—precipitated this discovery dispute.

### D. *The Disputed Documents*

Ms. Peeff is an important source of information at Clorox, no doubt due to her longevity and experience. (*See* Peeff. Decl. at ¶¶ 1–4.) Employees routinely confer with her on marketing and other issues.[5] Notably, Ms. Peeff took part in many discussions concerning Rain Clean. She raised several questions for consideration and provided advice in her capacity as a Legal Specialist on advertising and regulatory matters. Her statements are embodied in several documents. Ms. Peeff candidly acknowledges that she has "no specific recollection of consulting with attorneys in the Clorox legal department regarding the issues raised in these specific documents prior to responding to the questions." (*Id.* at ¶ 9.) The documents are as follows:

#### 1. *December 9, 1997 Minutes*

The first document reflects the minutes of a December 9, 1997 meeting between Ms. Peeff and a representative of the product development and marketing teams involved in the Rain Clean project. The minutes detail the issues discussed and identify areas for further exploration, including the product's efficacy and the risks associated with various product descriptions. Ms. Peeff was the only legal employee in attendance at the meeting.

#### 2. *January 26, 1998 Minutes and January 27, 1998 E-mail*

The second document is actually two distinct items. The first—two pages of handwritten notes—conveys the substance of a January 26, 1998 conference call. During that call, Ms. Peeff and several employees discussed Rain Clean and comparable products; marketing strategies; and possible product descriptions. Rachel Watson–Clark, a participant in the conference call, summa-

---

5. For example, Harold R. Baker testified that he "routinely" discusses "legal claims" and "substantiation issues" with Ms. Peeff. (Dep. Tr. of Harold R. Baker at 163:8–9.) Mr. Baker served as the initial director of the Rain Clean project.

rized the conversation in an e-mail, which she circulated the next day. The e-mail recounts the legal advice that Ms. Peeff rendered. Once again, Ms. Peeff was the only legal employee involved.

### 3. *December 28, 1999 E–Mail*

The third item is an e-mail from Ms. Peeff to another employee involved in the Rain Clean project. Her e-mail evaluates potential labels for the Rain Clean product. None of the recipients was an attorney.

### 4. *March 18, 1999 E–Mail*

The fourth document is an e-mail from Michael Robbins to several Clorox officials. The e-mail synthesizes advice that he received from Ms. Peeff on various legal issues associated with marketing Rain Clean.

In addition, Robbins attached to the e-mail his prior correspondence with Ms. Peeff. In the first attachment, Robbins asked questions about specific claims about Rain Clean, its contents, and effectiveness. In the second, Ms. Peeff responded and conveyed her strong views on these subjects.

As before, none of the individuals that received Robbins' e-mail was an attorney.

### 5. *May 11, 1999 E–Mails*

The final document comprises two e-mails to Ms. Peeff. The e-mails derive from the latter stages of the Rain Clean project, in which Clorox's marketing department debated the precise language to be employed on the packaging. Once more, no attorney received these e-mails.

## II. *DISCUSSION*

Strictly speaking, none of the documents in controversy reflect communications between attorney and client. That fact is not determinative however, as statements to and from non-attorneys may warrant protection on occasion. The question is, thus, whether Ms. Peeff's statements deserve attorney-client protection even though she is not an attorney. Prior to reaching this issue, the Court must first decide what privilege law to apply.

### A. *Applicable Law*

The Federal Rules of Evidence establish the framework for assessing evidentiary privileges. The applicable rule provides that:

[T]he privilege of a witness, person, government, State, or political subdivision thereof shall be governed by the principles of the common law as they may be interpreted by the courts of the United States in light of reason and experience. However, in civil actions and proceedings, with respect to an element of a claim or defense as to which State law supplies the rule of decision, the privilege of a witness, person, government, State, or political subdivision thereof shall be determined in accordance with State law.

Fed.R.Evid. 501. The rule dictates that, in pure federal question cases, federal privilege law controls, *see Wm. T. Thompson Co. v. General Nutrition Corp., Inc.,* 671 F.2d 100, 103 (3d Cir.1982); while in cases premised exclusively on state law, state privilege law applies, *see Pearson v. Miller,* 211 F.3d 57, 66 (3d Cir.2000). The rule does not, however, speak explicitly to mixed cases that raise federal and state claims. Fortunately, the Third Circuit has addressed this issue: "when there are federal law claims in a case also presenting state law claims, the federal rule ... rather than any state law privilege, is the controlling one." *Wm. T. Thompson,* 671 F.2d at 104. This precept applies with increased force when the disputed evidence is relevant to both the federal and state claims presented. *See Pearson,* 211 F.3d at 66 (applying federal law to resolve discovery dispute over material relevant to federal and state claims); *see also von Bulow v. von Bulow,* 811 F.2d 136, 141 (2d Cir.1987), *cert. denied by Reynolds v. von Bulow,* 481 U.S. 1015, 107 S.Ct. 1891, 95 L.Ed.2d 498 (1987) (observing that courts consistently apply federal law when evidence is relevant to federal and state claims).

This is a mixed case, raising both federal and state claims. HPD accuses Clorox of violating the Lanham Act, 15 U.S.C. § 1125, as well as committing unfair competition in violation of N.J.S. § 56:8–2 and New Jersey common law. The crux of these claims is that Clorox falsely advertised Rain Clean and

induced consumers to purchase that product under the mistaken impression that it contained an effective bleaching agent, all to HPD's detriment. The documents at issue are relevant to all of these claims because they concern Clorox's decision to market Rain Clean as a bleach-containing toilet cleaner. Where, as here, a case involves federal and state claims, and the evidence in dispute is relevant to both, federal privilege law governs. *See Wm. T. Thompson,* 671 F.2d at 104; *Pearson,* 211 F.3d at 66; *von Bulow,* 811 F.2d at 141.[6]

Without explanation, Clorox assumes that California law controls the outcome of this dispute. It goes on to cite a litany of California cases that extended attorney-client protection to communications involving paralegals and other attorney aids. The problem is that Clorox ignores Federal Rule of Evidence 501 as well as binding authority that directs trial courts to apply federal privilege law in mixed cases such as this. Absent a reasoned analysis, showing that California law applies, the Court finds Clorox's position untenable. Federal law will determine whether Ms. Peeff's statements merit protection.

B. *General Attorney–Client Principles*

■ The attorney-client privilege insulates from disclosure a discrete category of communications between attorney, client, and in some instances, third parties that assist the attorney to formulate and render legal advice. *See United States v. Kovel,* 296 F.2d 918, 922 (2d Cir.1961); *see also Westinghouse Electric Corp. v. Republic of the Philippines,* 951 F.2d 1414, 1424 (3d Cir.1991). The privilege does not apply merely because a statement was uttered by or to an attorney (or an attorney's agent). Nor does it attach simply because a statement conveys advice that is legal in nature. Instead, the privilege extends to " '*only* those disclosures—necessary to obtain informed legal advice—which might not have been made absent the privilege.' " *Id. at 1423–24 (quoting Fisher v. United States,* 425 U.S. 391, 403, 96 S.Ct. 1569, 1577, 48 L.Ed.2d 39 (1976)) (emphasis original).[7]

■ Although the privilege exists, quintessentially, to shield communications between attorney and client, it sometimes reaches further and covers statements to and from third parties. Due to the myriad complexities of modern litigation, attorneys and clients often rely on agents during the course of legal representation. *See Kovel,* 296 F.2d at 921. Their dialogue sometimes achieves attorney-client status. To qualify for protection, statements to and from third parties must "be made in confidence for the purpose of obtaining legal advice *from the lawyer.*" *Id.* at 922 (emphasis supplied); *United States v. Adlman,* 68 F.3d 1495, 1499 (2d Cir.1995) (recognizing that "the privilege ... can extend to shield communications to others when the purpose of the communication is to assist the attorney in rendering advice to the client"); *see also von Bulow,* 811 F.2d at 147 (rejecting paralegal's assertion of attorney-client privilege because she did not gather information to assist an attorney).

■ The law safeguards these communications to promote the full and free exchange of information and, in doing so, serves important public interests. *See Upjohn Co. v. United States,* 449 U.S. 383, 389, 101 S.Ct. 677, 682, 66 L.Ed.2d 584 (1981). Yet, because it restricts the availability of evidence, the privilege simultaneously obstructs the "truth-finding process." *Westinghouse,* 951 F.2d at 1423. To minimize this unavoidable consequence, courts narrowly construe the attorney-client privilege. *Id.; Waugh,* 191 F.R.D. at 430.

---

**6.** The Second Amended Complaint also sets forth patent infringement and tortious interference causes of action. The presence of these claims buttresses the conclusion that federal privilege law applies because the former arises under federal while the latter is a creature of state common law. *See Waugh v. Pathmark Stores, Inc.,* 191 F.R.D. 427, 430 (D.N.J.2000) (stating that "[i]n cases premised upon both federal and state law ... federal common law governs the evidentiary privileges, rather than state law").

**7.** While formulations vary slightly, the basic elements of the attorney-client privilege are (1) a statement that seeks or provides legal advice; (2) made between attorney and client; (3) in confidence; (4) provided that the privilege has not been abused or waived. *Compare Waugh,* 191 F.R.D. at 430 *with United States v. Rockwell Int'l,* 897 F.2d 1255, 1264 (3d Cir.1990). The proponent must satisfy each of these elements and establish that the privilege applies. *Waugh,* 191 F.R.D. at 430.

## C. Application

■ The disputed documents do not enjoy attorney-client protection because the statements contained in those documents were not made either *for the purpose of obtaining legal advice from an attorney* or *to assist an attorney to formulate and render legal advice to a client.* Instead, employees approached Ms. Peeff for her own legal views, which she willingly provided. Although Ms. Peeff may be a skilled advisor on marketing and regulatory matters, she is not an attorney. Accordingly, when she independently dispensed legal advice, her statements were not privileged.

### 1. Statements to Ms. Peeff

To varying degrees, each of the subject documents contains statements from Clorox employees to Ms. Peeff. Those employees clearly sought legal advice on a variety of issues associated with labeling and marketing Rain Clean. For example, the December 28, 1999 e-mail asked her to evaluate several product descriptions. The March 18 and May 11, 1999 e-mails posed similar questions.

These communications are not protected merely because they solicited legal advice or because they were directed to a paralegal. To invoke the attorney-client privilege, a client's statement must at minimum "be made in confidence for the purpose of obtaining legal advice *from the lawyer.*" *Kovel*, 296 F.2d at 922 (emphasis supplied). Clorox proffers no evidence that its employees approached Ms. Peeff to obtain advice from in-house or outside counsel. In fact, the opposite is true. The disputed documents convey statements and questions to Ms. Peeff herself. They do not, on their face, seek anything from Clorox's team of lawyers. This is not an oversight. In her more than fifteen years at Clorox, Ms. Peeff developed significant familiarity with marketing and regulatory matters. (Peeff Decl. at ¶¶ 1–5.) Recognizing her expertise, Clorox employees often sought out her opinions. Indeed, one of Clorox's project leaders averred that he routinely reviews all of his legal and substantiation issues with Ms. Peeff even though he knows that she is not a lawyer. (Dep. Tr. of Harold R. Baker at 163:8–9.)

While there is nothing wrong with Clorox employees using Ms. Peeff as a legal resource, there is also nothing privileged about their communications to her in this instance. Clorox has not demonstrated that its employees conferred with Ms. Peeff to obtain legal advice from counsel. Instead, they endeavored to obtain her own views and opinions. Accordingly, their statements are not privileged. *See Kovel*, 296 F.2d at 922 (opining that privilege does not apply where the advice sought is not the lawyer's); *Byrnes v. Empire Blue Cross Blue Shield*, No. 98 Civ. 8520, 1999 WL 1006312, at *4 (S.D.N.Y. Nov.4, 1999) (noting that the privilege does not "cover communications between a non-attorney and a client that involve the conveyance of legal advice offered by the non-attorney ...". Moreover, although not dispositive, Clorox has provided no evidence that its employees thought that their statements were privileged and that they would not have spoken to Ms. Peeff otherwise. As such, the rationale for applying attorney-client protection does not exist. *See Westinghouse*, 951 F.2d at 1423–24; *United States Postal Service v. Phelps Dodge Refining Corp.*, 852 F.Supp. 156, 163–64 (E.D.N.Y.1994) (suggesting that the privilege should not apply if the speaker would have made statements without protection).

The record also lacks evidence that Ms. Peeff relayed these statements to her supervisors in order to obtain legal advice for the interested employees. In fact, Ms. Peeff actually admits that she did not discuss or pass on the disputed documents—or the concerns raised in them—to in-house counsel. (Peeff Decl. at ¶¶ 5, 9.) This admission confirms that she did not function as a conduit of information for Clorox's lawyers. *See John Labatt Ltd. v. Molson Breweries*, 898 F.Supp. 471, 477 (E.D.Mich.1995) (finding privilege inapplicable because legal employee did not act as a conduit to and from counsel). Instead, she independently fielded questions from employees and responded with her own advice. Consequently, Clorox may not claim that the documents are protected because Ms. Peeff facilitated communication between its employees and their lawyers. *Id.*

### 2. Advice from Ms. Peeff

Most of the documents in controversy reflect Ms. Peeff's legal advice. The December 1997 and January 1998 minutes both flag her

concerns about Rain Clean's labeling; as does the January 27, 1998 email. Likewise, the December and March 1999 e-mails actually state Ms. Peeff's opinions about specific advertising claims. Clorox seeks to withhold these documents precisely because they reveal her legal views and the advice that she rendered prior to Rain Clean's introduction.

Ms. Peeff's statements are not privileged simply because she expressed legal advice or works in Clorox's legal department. Federal courts expand attorney-client protection to third-party communications for one reason: to facilitate the attorney's provision of legal advice to the client. *See Adlman*, 68 F.3d at 1499; *Kovel*, 296 F.2d at 922; *see also Westinghouse*, 951 F.2d at 1424 (acknowledging that third-party disclosures may receive protection because they are "sometimes necessary for the client to obtain informed legal advice"). Moreover, federal law does not recognize a freestanding "paralegal privilege." *Cf. von Bulow*, 811 F.2d at 146–47 (rejecting individual's attempt to assert privilege simply because she claimed to be a paralegal). Therefore, to qualify for protection, Ms. Peeff's statements must have been made to assist Clorox's attorneys to provide legal advice to their client. *Adlman*, 68 F.3d at 1499.

A paralegal's statements may assist an attorney because they pass on that attorney's advice to the client. *See John Labatt Ltd.*, 898 F.Supp. at 477 (noting that privilege applies where agent is a conduit from attorney to client). In this instance, however, Ms. Peeff did not function as a go-between. There is no evidence that she discussed the Rain Clean project at any time with in-house counsel. Accordingly, Clorox failed to carry its burden of showing that, when she spoke, Ms. Peeff was merely conveying the advice that she received from Clorox's lawyers. *See Waugh*, 191 F.R.D. at 430; *von Bulow*, 811 F.2d at 146 (reiterating that the party invoking the privilege bears the burden of proof and must come forward with persuasive evidence rather than unsubstantiated assertions).

A paralegal's statements may also be privileged because they convey advice formulated "under the supervision and at the direction of an attorney." *Byrnes*, 1999 WL 1006312 at *4; *Stryker Corp. v. Intermedics Orthopedics, Inc.*, 145 F.R.D. 298, 305 n. 3 (E.D.N.Y. 1992); *cf. Burlington Industr. v. Exxon Corp.*, 65 F.R.D. 26, 39 (D.Md.1974) (noting that documents prepared at lawyer's direction may be protected). Courts do not, however, safeguard advice that paralegals develop and disseminate on their own. *Cf. United States v. United Shoe Machinery Corp.*, 89 F.Supp. 357, 360–61 (D.Mass.1950) (finding that privilege did not apply to patent department employees that rendered their own legal and business advice). In her Declaration, Ms. Peeff admits that she did not consult with any lawyers before answering questions about Rain Clean. (Peeff Decl. at ¶ 9.) This admission, standing alone, constitutes a sufficient basis for concluding that her statements are not privileged because it shows that she acted independently.

Ms. Peeff's Declaration is, however, as important for what it does not say as for what it admits. Ms. Peeff does not, for example, indicate that she acted at in-house counsel's direction; that she responded to questions in accordance with express instructions from lawyers; or that she ever reported her activities to her attorney supervisor. These omissions are material, particularly because Clorox has not presented any evidence—such as an affidavit from in-house counsel—that would even suggest that Ms. Peeff acted either at the direction or under the actual supervision of a lawyer. Given the absence of such evidence, the Court finds that Ms. Peeff conveyed her own advice. That advice, while legal in nature, is not privileged. *See Byrnes*, 1999 WL 1006312 at *4.[8]

Clorox attempts to avoid this conclusion by pointing out that Ms. Peeff works within its

---

8. The *Byrnes* decision is instructive. There, plaintiffs subpoenaed documents from an actuarial firm. The actuary generated those documents to assist defendant in deciding whether to alter its retirement benefits package. Two of the documents summarized legal research conducted by a non-attorney. Defendant moved to quash, claiming that the documents enjoyed attorney-client protection. The court disagreed. It held that neither document was privileged because both were prepared by a non-attorney who did not act at the request or under the supervision of a lawyer. *Byrnes*, 1999 WL 1006312 at *4. The facts of this case are analogous: Ms. Peeff, a non-attorney, gave legal advice without direction from a lawyer.

legal department under attorney supervision. (Peeff Decl. at ¶¶ 2–3; 5; 8.) It further highlights that, over time, she received training from lawyers to deal with diverse legal and regulatory issues and used the basic knowledge she acquired to provide the specific advice in question. (*Id.* at ¶ 4.) Finally, Clorox notes that Ms. Peeff meets with attorneys when "unusual or novel" compliance issues arise. (*Id.* at 6.) Based on these facts, Clorox posits that Ms. Peeff actually transmitted privileged advice.

Clorox's position is flawed for several reasons. First, although Ms. Peeff may function under the theoretical direction of an attorney, she did not receive any discernible supervision or guidance in this case. The record is bereft of evidence to the contrary. Thus, affording protection to Ms. Peeff's advice would stretch the privilege well beyond its established bounds. Indeed, it would be tantamount to recognizing a new privilege for independent paralegal advice. This leap is unwarranted, given the preference for construing evidentiary privileges narrowly, *see Westinghouse,* 951 F.2d at 1423, and the federal judiciary's relative unwillingness to sanction new privileges, *see Pearson,* 211 F.3d at 67.

■ Second, Ms. Peeff's statements are not inherently privileged merely because she is a legal employee. The attorney-client privilege is not susceptible to categorical rules of application. Instead, courts must carefully scrutinize the particular circumstances involved each time a litigant invokes the privilege. *Waugh,* 191 F.R.D. at 430. Recognizing as much, several federal courts have rejected the blanket assertion that a communication is privileged solely because it came from a legal employee. In *John Labatt Ltd.,* for example, defendants sought to compel plaintiff to produce documents that reflected communications from an employee in plaintiff's legal department. The employee, a non-attorney, served as plaintiff's "Intellectual Property Officer," registered patent agent, and advisor on trademark law. *John Labatt Ltd.,* 898 F.Supp. at 473–76. Plaintiff

argued that the employee's statements were privileged, in part, because of his status as an advisor on trademark and intellectual property matters. The court rejected that argument outright, deeming it "without authority." *Id.* at 476. Instead of deferring to the employee's status, the court focused on the specific facts before it. Because the employee was not an attorney, nor authorized to practice trademark law, the court refused to extend the privilege. *Id.* The same approach is appropriate in this case. Ms. Peeff is not automatically entitled to attorney-client protection just because she is a paralegal. Her activities, not her job title, determine whether that protection is warranted. *Id.; United Shoe Machinery Corp.,* 89 F.Supp. at 360.

Third, the documents at issue are not protected simply because Ms. Peeff received generalized legal training, which she subsequently used to advise Clorox's employees.[9] A non-lawyer's statements do not automatically become privileged simply because, at some point, that person interacted with or learned from an attorney. *Cf. Burlington Industr.,* 65 F.R.D. at 40 (recognizing that "the privilege was not intended to permit the attorney to dub all persons with whom he has contact as his agents, thereby cloaking all such communications with protection"). To hold otherwise would give in-house counsel a strategic incentive to impart basic legal knowledge to corporate employees and then, during litigation, claim that statements made by those employees in the regular course of business are protected because they build on or derive from counsel's teachings in some manner. Such a construction would subject the privilege to abuse and, hence, must be avoided. *Cf. Phelps Dodge Refining Corp.,* 852 F.Supp. at 163–64 (refusing to allow corporations to insulate internal memoranda by sending courtesy copies to in-house counsel).

### III. *CONCLUSION & ORDER*

Clorox urges the Court to extend the attorney-client privilege to cover statements to and from a paralegal. This request is not extraordinary in the abstract. Third parties,

9. Ms. Peeff's Declaration confirms that she received only "general guidance and direction from many Clorox in-house attorneys regarding how to respond to a wide range of legal and regulatory issues relating to labeling and advertising." (Peeff Decl. ¶ 4.) There is no evidence that she received instruction on any of the particular issues that cropped up during the Rain Clean project.

including paralegals, receive protection when they facilitate the provision of legal advice between attorney and client. The problem for Clorox is that the facts of this case do not fall within this rubric. Ms. Peeff did not assist employees to obtain legal advice from their lawyers. Nor did she pass on attorney advice to those involved in the Rain Clean project. Instead, she functioned as an independent source of legal advice. She did not consult with, report to, or receive specific instruction from a lawyer with respect to any of the statements contained in the disputed documents. Consequently, those documents are not privileged. For all of these reasons:

It is on this 8 day of June 2001:

ORDERED that HPD's discovery application to compel Clorox to produce statements to and from Ms. Peeff is GRANTED; and it is further

ORDERED that Clorox shall turn over these documents within 15 days of the date of this Opinion.